352 S.E.2d 741

**STATE ex rel. A.V. DODRILL, Comm'r, etc., et al.**

v.

**The Honorable George M. SCOTT, Judge, etc.**

No. 17295.

Supreme Court of Appeals of West Virginia.

Dec. 19, 1986.

Dissenting Opinion Jan. 9, 1987.

Charles G. Brown, Atty. Gen., Dana Davis, Asst. Atty. Gen., Charleston, for appellant.

George M. Scott, John D. Hoffman, Pros. Atty., Robert Fisher, Asst. Pros. Atty., Ripley, Robert B. King, Robert A. Goldberg, King, Betts & Allen, Charleston, for appellee.

BROTHERTON, Justice:

In this case the petitioners, A.V. Dodrill, Commissioner, West Virginia Department of Corrections, C.M. White, Warden, Huttonsville Correctional Center, and Joe Sylvester, Associate Warden, Huttonsville Correctional Center, seek a writ of prohibition to prohibit the respondent, The Honorable George M. Scott, Judge of the Circuit Court of Jackson County, from ruling upon the validity of Executive Order 11–86 and from finding the petitioners in contempt of court for complying with the Executive Order in refusing to admit inmates to the Huttonsville Correctional Center. After an examination of the petition, the response and the appropriate law, we find the petitioners' case to be unpersuasive and deny the writ of prohibition.

On February 22, 1985, the Honorable Larry V. Starcher, sitting by special assignment as judge of the Circuit Court of Randolph County, found the Huttonsville Correctional Center to be unconstitutionally overcrowded. *Nobles v. Gregory,* Civil Action No. 83–C–249 (Circuit Ct. Randolph County, W.Va. 1985). In its memorandum order, the circuit court provided the Department of Corrections one year to reduce the inmate population at Huttonsville to 500 or less. However, because the rate of sentencing continued to exceed the rate of release, the population at Huttonsville actually increased during the ensuing year.

In order to alleviate the overcrowding, Judge Starcher began entering release orders for certain inmates at Huttonsville on March 27, 1986. On April 4, 1986, the Commissioner of Corrections filed with this Court a motion seeking a stay of Judge Starcher's release orders pending appeal of the underlying decision. We granted the stay, which remained in effect until May 8, 1986, at which time we denied the department's petition for appeal.

On May 26, 1986, the Governor of West Virginia, Arch A. Moore, Jr., issued and implemented Executive Order No. 11–86, which directed the Commissioner of the Department of Corrections to accept no further inmates into his custody until such time as the Governor and the Commissioner determined that the conditions at each institution were appropriate and warranted the acceptance of additional inmates.

Between June 5, 1986, and July 29, 1986, four convicted felons, namely James Spencer, William Stanley, Timothy Redman, and Clifton Boggess, were ordered by the Circuit Court of Jackson County to be remanded to the custody of the Commissioner of the Department of Corrections for confinement in the Penitentiary of this State. However, Robert R. Westfall, Sheriff of Jackson County, was advised by petitioner Joe Sylvester, Associate Warden of Huttonsville Correctional Center, that, based upon the authority of Executive Order No. 11–86, neither the Huttonsville Correctional Center nor the Department of Corrections would accept custody of four inmates despite the commitment orders of the Circuit Court of Jackson County.

On July 30, 1986, the prosecuting attorney of Jackson County presented to the circuit court an affidavit from the Sheriff of Jackson County. This affidavit advised that the sheriff had contacted the Huttonsville Correctional Center regarding the transfer of certain inmates to that facility and that such a transfer was denied based solely upon the authority of Executive Order No. 11–86. The lower court, *sua sponte*, then ordered the prosecuting attorney to prepare a rule to show cause why petitioners were not in contempt of court for their refusal to accept these inmates at Huttonsville Correctional Center.

At an August 18, 1986, hearing on the contempt charges the alleged contemnors appeared by counsel before the Circuit Court of Jackson County. The parties stipulated the material facts and the court heard argument upon the pertinent legal issues. The court ruled that Executive Order No. 11–86 was invalid and in derogation of both the constitutional and statutory obligations of the Governor, and ordered the Commissioner of Corrections and the members of the Department of Corrections to accept inmates duly sentenced by the circuit court. The court further ordered that: 1) the petitioners were in willful and contumacious contempt of court; 2) the petitioners must accept custody of inmates Redman, Spencer, Boggess and Stanley by 12:00 noon on August 22, 1986, in default of which petitioners must surrender themselves to the Sheriff of Jackson County, to be held in the Jackson County Jail until such time as they complied with the orders of the circuit court respecting the commitment of these inmates to state institutions; and 3) if the petitioners refused to comply with the orders of the court as set forth above, the clerk must issue a warrant for the arrest of petitioners.

On August 20, 1986, this Court issued a rule directing Judge George M. Scott of the Circuit Court of Jackson County to show cause why a writ of prohibition should not be awarded with respect to the August 18, 1986, contempt rulings, and ordering that the proceedings below be stayed pending this Court's final decision, which we now pen. On September 2, 1986, Governor Moore issued Executive Order No. 14–86, which superseded Executive Order No. 11–86. Executive Order No. 14–86 directs the West Virginia Department of Corrections to accept convicted persons to its penal facilities located at Moundsville, Huttonsville and Anthony on a priority basis, the details of which are set forth in the Executive Order. Nevertheless, Executive Order No. 14–86 does not allow the West Virginia Department of Corrections to accept for custody all inmates duly sentenced to confinement in a state penal facility and, in fact, the Executive Order expressly establishes maximum capacity with respect to prison populations at the West Virginia Penitentiary, Huttonsville Correctional Center and the Anthony Center, at 575, 490 and 100 respectively.

Inmates Stanley, Redman and Boggess have since been accepted for confinement in a state penal facility, mooting the civil contempt proceedings in the cases of *State v. Stanley, State v. Redman,* and *State v. Boggess.* However, petitioners continue to refuse to accept inmate Spencer, who remains lodged in the Jackson County Jail. The petitioners' refusal to accept inmate Spencer is apparently based on the authority of Executive Order No. 14–86. The enforcement of Judge Scott's order with respect to inmate Spencer, therefore, remains an issue in this proceeding, and this issue now includes whether Executive Order No. 14–86 is valid. We conclude that Executive Orders No. 11–86 and No. 14–86 are in conflict with the statutory law of this State, and therefore deny the petitioners' writ of prohibition.

I.

Chapter 61 of the *W.Va.Code,* which identifies and defines crimes in West Virginia, prescribes the penalties to be imposed upon persons convicted in this State. For example, inmate Redman was convicted of breaking and entering under *W.Va. Code* 61–3–12 [1923], which provides that anyone so convicted *"shall* be confined in the *penitentiary* not less than one nor more than ten years."* (Emphasis added). Inmate Boggess was convicted of a third

offense of driving under the influence of alcohol pursuant to *W.Va.Code* 17C–5–2(i) [1986], which provides that anyone so convicted "*shall* be imprisoned in the *penitentiary* for not less than one nor more than three years." (Emphasis added).

The statutes cited above are only two among a host of West Virginia penal statutes that provide that a person convicted of such and such a crime *shall* be imprisoned in the *penitentiary.* "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syl. pt. 1, *Nelson v. W.Va. Public Employees Ins. Bd.,* 171 W.Va. 445, 300 S.E.2d 86 (1982). *West Virginia Code* 61–11–1 [1965] defines "penitentiary" as "any and all institutions *provided by the State* for the confinement of persons sentenced to confinement in the penitentiary ..." (emphasis added). The legislature has thus imposed upon the judiciary, the Department of Corrections, and all other officials involved in the post-conviction custodial care of convicted felons, a mandatory, nondiscretionary duty to imprison these convicts in facilities "*provided by the State.*" Penal statutes invoking such mandatory language therefore do not permit the imprisonment of those convicted under them in *county* facilities. Yet the inevitable result of Executive Orders No. 11–86 and No. 14–86 is that convicts sentenced under such statutes *will* be imprisoned in county facilities.

▉▉▉ A second class of penal statutes creates only a discretionary duty to imprison those convicted under such statutes in a state penitentiary. For example, inmate Spencer was convicted of grand larceny under *W.Va. Code* 61–3–13(a) [1977], which provides that those so convicted "shall be confined in a penitentiary not less than one nor more than ten years, or, *in the discretion of the court,* be confined in the county jail not more than one year and shall be fined not more than five hundred dollars." (Emphasis added). Thus, although imprisonment in a pentientiary is under some penal statutes a matter of discretion, that

discretion is vested in the judiciary rather than the executive. In the absence of an exercise of such discretion by the court, the statute creates a mandatory, non-discretionary duty to imprison those so convicted in the state penitentiary. The effect of Executive Orders No. 11–86 and No. 14–86 is to vest the ultimate discretion regarding where a convict shall be imprisoned in the executive.

*West Virginia Code* 62–13–5 [1977] provides in part:

> All persons committed by courts of criminal and juvenile jurisdiction for custody in penal, correctional or training institutions under the jurisdiction of the commissioner of corrections *shall be committed to an appropriate institution,* but the commissioner (or the director if the commissioner so approves) shall have the authority to and may order the transfer of any person to any appropriate institution *within the department.* (Emphasis added).

The language of the statute is mandatory, and requires the Commissioner of the Department of Corrections to accept for confinement all persons sentenced by courts of this State to state penal facilities. The jails of various counties, however, are not institutions within the West Virginia Department of Corrections. Thus *W.Va. Code* 62–13–5 [1977] prohibits the Commissioner of the Department of Corrections from lodging or forcing to be lodged in a county jail any person sentenced by a circuit court of this State to a state penal facility.

Moreover, *W.Va. Code* 28–5A–7 [1970] provides in part:

> Notwithstanding any provision of the *Code* to the contrary, all prisoners sentenced to the West Virginia penitentiary at Moundsville after October one, one thousand nine hundred seventy, *shall, upon imposition of such sentence,* first undergo diagnosis and classification at the Huttonsville correctional center. (Emphasis added).

Once again, the language of the statute is mandatory. By not permitting the Commissioner to accept inmates for classification and diagnosis at Huttonsville upon im-

position of sentence, Executive Orders No. 11–86 and No. 14–86 require the Commissioner to forbear from the exercise of his non-discretionary duties under *W. Va. Code* 28–5A–7 [1970].

■ Our statutory scheme thus not only contemplates, but mandates, a system in which convicts sentenced to the penitentiary are received by the Department of Corrections and incarcerated in a *State* penal facility. As a result of the current condition of our state prisons, obedience to this statutory scheme leads inexorably to unconstitutional overcrowding. The safety valve on the system, however, is the Governor's power of reprieve, pardon and parole set forth in *W. Va. Const.* art. 7, § 11 and *W. Va. Code* 5–1–16 [1923]. Convicts *must* be accepted *by the State* for incarceration; but to bring our overcrowded prisons into constitutional compliance, the Governor may pardon, parole, transfer, or otherwise make constitutional accommodations for those convicts already incarcerated. This leads to socially undesirable consequences. Nevertheless, until the legislature either amends the statutory scheme of sentencing and commitment or appropriates the funds necessary to provide constitutional accommodations for all incarcerated convicts, it is the only permissible course of action open to the Governor.

## II.

We are not unsympathetic to the Governor's position in this case. Indeed, the circumstances that have brought this case to us have placed the Governor in a constitutional vise. The decision of this Court in *Crain v. Bordenkircher,* 176 W.Va. 338, 342 S.E.2d 422 (1986), and that of the Circuit Court of Randolph County in *Nobles v. Gregory, supra,* have declared the state penal facilities at Moundsville and Huttonsville to be unconstitutionally overcrowded and below minimal standards in meeting custodial care requirements. Thus, if the Commissioner of the Department of Corrections accepts further inmates into these facilities he: (1) exacerbates an already unconstitutional situation, and (2) runs the risk of being found in contempt of the Circuit Court of Randolph County. On the other hand, if the Governor seeks to make room for additional inmates by exercising his powers of reprieve, pardon or parole, he runs the risk of releasing into the community dangerous felons who ought to be incarcerated.

The conditions of overcrowding in this State's penal facilities are a persistent, deplorable problem. However, due to the dire financial straits in which the State currently finds itself, prison reform is not at the top of the legislative agenda. Prison reform has for years been somebody else's problem. The Governor hoped that the issuance of Executive Order No. 11–86 and No. 14–86 would put political pressure from county officials on their legislators to find new money for prison construction as a possible solution. Unfortunately, the laws of this State will not permit it.

We are aware that the Department of Corrections has made some attempts during the last year to alleviate the unconstitutional overcrowding at the State's penal facilities. The Department of Corrections, with the cooperation of the Governor, has made progress through the use of good time awards, early release programs, commutations, transfers to other facilities, outside work projects, work release centers, and parole. We applaud these efforts, but would much prefer adequate facilities so that prisoners may serve the full sentence imposed upon them.

The sad part of the whole situation is that neither the Governor nor the Legislature has seen fit to prepare a master plan that can be implemented, even on a piecemeal basis as funds become available. Expertise in the field of penology dealing with facilities and the proper housing of prisoners is available at a reasonable cost, but those charged by the constitution and the laws of this State, the Governor and the Legislature, have not seen fit to avail themselves of this service. Problems seldom correct themselves. It is time someone took charge and formulated a plan, independent of regional concerns and political dictates, that will modernize our penal system for today and for tomorrow. We are

already woefully late, and to start immediately is not soon enough. Crime will always be with us. There are those among us who will not or cannot conform to the norms of society and must be confined. We must have a place to put them. Why must the courts continue to be the forum for the settlement of the rights of prisoners when it is the duty of the executive and legislative branches of the government? Courts do not want to undertake these matters, but they will not stand by and see the rights of citizens, even if they are prisoners, denied or abridged. Our oath will not allow us to do less.

We hear and read statements from the executive and legislative branches of government that they are trying and things have improved, but that is like ringing a bell without a clapper. How can any of that be true when we regularly read of mayhem and executions being carried out almost at will by fellow inmates. As long as those responsible for overseeing the operation of our penal system allow those on the inside to dictate who lives and who dies, and those charged with that duty allow it to continue without even addressing the problem, courts will of necessity intervene when the matter comes before them.

In the State of Alabama, a federal court put the penal system in receivership because of the failure of those in charge to operate the system in conformity with the constitution and laws of that state. *See Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala. 1976). The court then operated the system by appointing a Human Rights Committee for the Alabama Prison System with the authorities to implement standards for prison operation promulgated by the court. *Id.* at 331–32. This is not a step any court likes to take, but there are times, when there is no evidence of concern, no evidence of a master plan that can be implemented within a reasonable time, and a continuation of mayhem and death even though there are representations that things are better, that a court has little choice.

### III.

Petitioners contend that Executive Orders No. 11–86 and No. 14–86 are valid exercises of the Governor's emergency powers under the West Virginia Emergency Services Act, *W. Va. Code* 15–5–1 through 15–5–23. In support of this contention, petitioners refer us to two New Jersey decisions, *Worthington v. Fauver,* 180 N.J.Super. 368, 434 A.2d 1134 (App. Div.1981) (hereafter *"Worthington* I"), and *Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982) (hereafter *"Worthington* II"), which affirmed *Worthington* I. In *Worthington* I and *Worthington* II, the Governor of New Jersey issued an Executive Order ordering the Commissioner of the Department of Corrections to accept no further inmates into the New Jersey state penal facilities due to the severe overcrowding in those facilities. The New Jersey courts upheld the Executive Order as a valid exercise of the Governor's emergency powers under the New Jersey Civil Defense and Disaster Control·Act, N.J.Stat. Ann.App. A:9–30 *et seq.*

■ We note, however, that in *Worthington* I and *Worthington* II, the Governor of New Jersey had issued his Executive Order pursuant to a declared state of emergency. In the case before us, however, there has never been any type of declaration by the Governor of West Virginia that an emergency exists within the state correctional system. *W. Va. Code* 15–5–6 [1973] provides that the emergency powers of the Governor "shall be operative only during the existence of a state of emergency." Because no state of emergency has been declared, the Governor's emergency powers cannot be the basis for the validity of Executive Orders No. 11–86 and No. 14–86.

■ Further, we do not believe that prison overcrowding is an event that triggers the Governor's emergency powers under the West Virginia Emergency Services Act, *W. Va. Code* 15–5–1 *et seq. West Virginia Code* 15–5–6 [1973] provides as follows:

The existence of a state of emergency may be proclaimed by the governor or by concurrent resolution of the legislature if the governor in such proclamation, or the legislature in such resolution, finds that

an attack upon the United States has occurred or is anticipated in the immediate future, *or that a natural or manmade disaster of major proportions has actually occurred or is imminent within the State,* and that the safety and welfare of the inhabitants of this State require an invocation of the provisions of this section. Any such emergency, whether proclaimed by the governor or by the legislature, shall terminate upon proclamation of the termination thereof by the governor, or the passage by the legislature of a concurrent resolution terminating such emergency. (Emphasis added).

*W.Va. Code* 15-5-1 [1978] sets forth the general policy and purpose of emergency services and provides in pertinent part as follows:

In view of the existing and increasing possibility of *the occurrence of disasters of unprecedented size and destructiveness,* resulting from enemy attack, sabotage or other hostile action, or from fire, flood, earthquakes or other natural or man-made causes and in order to insure that preparations of this State will be adequate to deal with such disasters, and generally to provide for the common defense and to protect the public peace, health and safety and to preserve the lives and property of the people of the State, it is hereby found and declared to be necessary.... (Emphasis added).

These provisions of the *Code* do not contemplate prison overcrowding as a state of emergency.[1] We therefore hold that the overcrowded condition of the State's penal facilities is not a situation subject to the emergency powers of the Governor set forth in *W.Va. Code* 15-5-6.[2]

## IV.

Having determined that Executive Orders No. 11-86 and No. 14-86 are invalid, we now turn to the question of whether contempt is proper. *W.Va. Code* 61-5-26 [1923] provides: "The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: ... (d) disobedience to or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court." This section clearly grants to courts the authority to hold in contempt any person who disobeys a lawful order of the court. The petitioners do not contend that the Circuit Court of Jackson County did not have jurisdiction over the four criminal cases out of which these contempt proceedings arose. Nor do the petitioners contend that the court's orders of commitment were unlawful. The petitioners raise two defenses, both of which we find unavailing.

■ First, the petitioners contend that the proper venue for the contempt proceedings is in the Circuit Court of Kanawha County. *W.Va.Code* 14-2-2 [1976] provides in part: "(a) The following proceedings shall be brought and prosecuted only in the Circuit Court of Kanawha County: (1) Any suit in which the governor, or any other state officer, or a state agency is made a party defendant, except as a garnishee or suggestee." That section does not apply to the case at bar; these contempt proceedings are not original proceedings brought against a state officer. The proceedings were ancillary to a criminal action over which the Circuit Court of Jackson County had jurisdiction and for which

---

1. We note that the New Jersey Disaster Control Act defined "disaster" to include "any unusual incident." Although we express no opinion on the merits of the *Worthington* cases, we are of the opinion that the term "any unusual incident" is substantially more expansive than either "natural or manmade disaster of major proportions" or "disasters of unprecedented size and destructiveness."

2. Additionally, it is noteworthy that the New Jersey governor's executive order expressly pro-

vided for compensation to the counties for the care and maintenance of state prisoners in county facilities, a provision "obviating a major concern." *Worthington* II, 440 A.2d at 1137. No such provisions exist in either of Governor Moore's executive orders. The Governor has instead shifted the financial burden of the maintenance of the various state prisoners from the State to the counties, most of which do not possess the funds for such prolonged maintenance.

that court was the proper venue. *W.Va. Code* 61–5–26 [1923] provides the circuit court with the power to hold in contempt any person disobeying a lawful order issued in a case in which the court has jurisdiction and venue is proper. Because we believe that *W.Va.Code* 14–2–2 [1976] applies only to *original* proceedings against a state official, we hold that it does not mitigate the authority granted to the circuit courts by *W.Va. Code* 61–5–26 [1923].

■ Second, petitioners contend that they are insulated by *W.Va. Code* 61–5–18 [1923], which provides:

> No officer in the lawful exercise or discharge of his official duty under any act of the legislature, or any order or proclamation of the governor of this State, shall be held personally responsible therefore in any action, suit, prosecution or proceeding, civil or criminal, by reason of such act, order or proclamation being *afterwards* adjudged by any court of this State to be unconstitutional. Nor shall his official bond be liable in any civil proceeding therefor. (Emphasis added).

It is true that Judge Scott found the petitioners to be in contempt on August 18, 1986, moments after declaring Executive Order No. 11–86 void. However, Judge Scott granted the petitioners until August 22, 1986, to comply with his orders by accepting custody of the four inmates. Moreover, petitioners obtained a stay of execution of the contempt orders from this Court, which has remained in effect throughout the pendency of this proceeding. Petitioners have thus been aware of Judge Scott's invalidation of Executive Order No. 11–86 for over three months. Petitioners therefore have not been denied the lack of adequate notice against which *W.Va.Code* 61–5–18 [1923] seeks to shield state officials.

We hold, therefore, that the orders of the Circuit Court of Jackson County finding the petitioners in contempt were proper, subject, of course, to petitioners' rights to purge themselves. The writ of prohibition for which petitioners pray is denied, and the stay heretofore awarded is vacated. The Circuit Court of Jackson County, however, shall provide petitioners with a reasonable time to comply with its order before imposing any sanctions for contempt.

Writ denied.

NEELY, Justice, concurring in part and dissenting in part:

I

I dissent to the majority's holding today simply because I find that the governor has handled an impossible problem in a politically reasonable fashion. As the majority points out, "[t]he conditions of overcrowding in this state's penal facilities are a persistent, deplorable problem. However, due to the dire financial straits in which the state currently finds itself, prison reform is not at the top of the legislative agenda. Prison reform has for years been somebody else's problem." By backing up felons in the county jails, the governor has made all counties acutely aware of the need to bring the state's prisons up to constitutional standards. The public officials—sheriffs, judges, and county commissioners—of the various counties may in turn be expected to put pressure on their local legislators to make necessary appropriations.

Regardless of what is decided in this case, the physical circumstances of desperately poor, overcrowded facilities dictate that some provision of the *Constitution* or the general laws are going to be violated. Initially, both this Court and federal courts have established certain minimal constitutional protections for inmates in the state penitentiaries. We have already held that these standards are not being met. *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986). However, the statutory law of this state demands that persons convicted of felonies who are not placed on probation be committed to the penitentiary. Furthermore, *W.Va. Const.* art. III, § 5, provides that "[p]enalties should be proportioned to the character and degree of the offense," which implies both a right and an *obligation* to punish. But, as the governor well understands, there is no penitentiary fit to receive those who merit punishment.

The majority suggests that the governor may use his pardon and commutation powers to relieve the overcrowding, but that confounds the overall structure of the criminal law which demands that malefactors be punished.

Speech making and hortatory language do not build new prisons: money builds new prisons. Furthermore, we cannot logically infer that in a depressed State like West Virginia, our threatening to release inmates before their sentences have been completed will inspire legislators to appropriate between fifty and a hundred million dollars during one fiscal year to build a new prison. Unless this Court can figure out a way to give our governor and legislature money to work with, I fear that we shall simply remain a disembodied voice crying in the wilderness.

For reasons that I shall discuss below involving the inherent conflict between desirable but inconsistent provisions of the law, I would find in this case that the governor has acted properly and that his conclusion that the most appropriate way to handle the current overcrowding problem is to use the county jail facilities is an appropriate exercise of his policymaking discretion. Accordingly I would award the Writ of Prohibition.

## II

Although not an issue raised directly in this case, the big stumbling block to prison reform is not a lack of humanitarian impulses on the part of either the governor or the legislature but, rather, *W.Va.Code*, 12–3–17 [1983], *W.Va. Const.*, art. VI, § 51, and *W.Va. Const.*, art X, § 4, all of which relate to limitations governing the financing of state-owned or leased facilities. *W.Va.Code*, 12–3–17 [1983] provides as follows:

> Except as provided in this section, it shall be unlawful for any state board, commission, officer or employee: (1) To incur any liability during any fiscal year which cannot be paid out of the then current appropriation for such year or out of funds received from an emergency appropriation; or (2) to authorize or to pay any account or bill incurred during any fiscal year out of the appropriation for the following year: Provided, that nothing contained herein shall prohibit entering into a contract or lease for buildings, land and space, the cost of which exceeds the current year's appropriation, even though the amount is not available during the then current year, if the aggregate cost does not exceed the amount then authorized by the legislature. Nothing contained herein shall repeal the provisions of the general law relating to the expiration of appropriations for buildings and land.

> Subject to the provisions of chapter five-A, article five [§ 5A–5–1 et seq.] of the Code of West Virginia, one thousand nine hundred thirty-one, as amended, the department of finance and administration is hereby authorized to enter into long-term lease agreements for buildings, land and space for periods longer than one fiscal year. Such long-term lease agreements shall not be for periods in excess of forty years and shall contain, in substance, all the following provisions:

> (1) That the department of finance and administration, as lessee, shall have the right to cancel the lease without further obligation on the part of the lessee upon giving thirty days' written notice to the lessor, such notice being given at least thirty days prior to the last day of the succeeding month;

> (2) That the lease shall be considered canceled without further obligation on the part of the lessee if the state legislature or the federal government should subsequently fail to appropriate sufficient funds therefor or should otherwise act to impair the lease or cause it to be canceled; and

> (3) That the lease shall be considered renewed for each ensuing fiscal year during the term of the lease unless it is canceled by the department of finance and administration before the end of the then current fiscal year.

> Any member of a state board or commission or any officer or employee violating any provision of this section shall be

personally liable for any debt unlawfully incurred or for any payment unlawfully made.

Basically, the constitutional and statutory provisions just cited effectively prohibit the legislature from doing the one thing that might work in the prison fiasco—namely, lease/purchase a new, modern prison from a private corporation, public corporation, or state authority. Such a scheme is hardly a new idea: this Court has approved long-term contracts, but, pursuant to the constitutional mandates, we have always required as a condition of approval, that the credit of the State not be pledged and that bondholders or private entrepreneurs assume the risk that the State may decide to terminate a long-term contract at any time. That, of course, isn't much of a contract. *State ex rel. West Virginia Resource Recovery Solid Waste Disposal Authority v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984).

We regularly authorize the issuance of special revenue bonds when there are receipts from sources other than general revenue to service the indebtedness and the state's general tax revenue is not pledged. *State ex rel. County Court v. Demus*, 148 W.Va. 398, 135 S.E.2d 352 (1964); *State ex rel. Board of Governors v. O'Brien*, 142 W.Va. 88, 94 S.E.2d 446 (1956); *State ex rel. Kanawha County Bldg. Comm'r. v. Paterno*, 160 W.Va. 195, 233 S.E.2d 332 (1977).

The problem with constructing a prison is that it is unlikely that a private corporation, public corporation, or state authority will be willing to undertake the construction without the guarantee of a long-term lease because there is no alternative use for a prison. Furthermore, a prison does not enjoy the political popularity of a football stadium, nor does it generate any revenues to support itself that are outside the purview of the "credit of the State." And to make matters worse, the active involvement of courts in the whole prison problem presents the spectre that today's modern prison may not find favor with tomorrow's federal judges.

Under ordinary circumstances one cannot quarrel with the general proposition that *W.Va. Const.*, art. X, § 4, *W.Va. Const.*, art. VI, § 51, and *W.Va.Code*, 12–3–17 [1983] should be strictly enforced. These constitutional and statutory provisions reflect centuries of received wisdom and are one of the bulwarks of popular, responsive, fiscally sound, democratic government.

Nonetheless, the *U.S. Constitution's* cruel and unusual punishment provision and our own *W.Va. Const.*, art. III, § 5, equally reflect centuries of received wisdom. By age encrusted tradition, the cynosure of our criminal justice system is punishment by imprisonment rather than by transportation, execution, mutilation, branding, or flogging. Yet, as the majority points out, there is little sense of urgency about the matter among the electorate. Thus, as the majority opinion indicates, all of us in this process are placed between a constitutional Scylla and a political Charybdis. The interrelationship of our constitutional provisions, statutory mandates, and historically received methods of handling miscreants absolutely guarantee that if something doesn't give somewhere, nothing whatsoever will happen except the generation of rapidly accelerating acrimony among equally humanitarian and enlightened branches of government and eventual intrusion into our domestic affairs by the federal courts.

Therefore, my candidates for the things that give are *W.Va. Const.*, art. X, § 4, *W.Va. Const.*, art. VI, § 51, and *W.Va. Code*, 12–3–17 [1983]. In my opinion, this result is mandated by the supremacy clause of the *Constitution of the United States* because our prisons do not pass federal standards and for that reason alone we have one of two choices: Either we must release a significant number of our inmates upon an unsuspecting world, or we must build new facilities. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Since our State *Constitution* obviously envisages punishment for felons, but at the same time, places limits on bonding authority and leasing arrangements, the

only choice that we really have is to elect which of two desirable constitutional goals we wish to achieve; we cannot achieve both at once in the face of the *Constitution of the United States.*

I arrive at this conclusion with great reluctance because exceptions to *W. Va. Const.*, art. X, § 4 and related provisions is the fiscal equivalent of the atomic bomb. Yet the preeminent authority for my conclusion in this regard comes from Mark 2:23–27, where it is said:

> "And it came to pass, that he went through the corn fields on the sabbath day; and his disciples began, as they went, to pluck the ears of corn. And the Pharisees said unto him, Behold, why do they on the sabbath day that which is not lawful? And he said unto them, Have ye never read what David did, when he had need, and was an hungred, he, and they that were with him? How he went into the house of God in the days of Abiathar the high priest, and did eat the shewbread, which is not lawful to eat but for the priests, and gave also them which were with him? And he said unto them, The sabbath was made for man, and not man for the sabbath."

The fact of the matter is that we are currently spending almost as much money renovating and otherwise operating obsolete facilities as we would need to appropriate each year to retire the indebtedness on a new prison.[1] According to figures provided by the Legislative Auditor, $3 million was budgeted for prison capital outlay in 1986–87 alone and $2 million was budgeted for the same purpose each of the two previous years. This expense does not reflect other costs associated with running obsolete facilities, such as excessive ordinary maintenance, excessive numbers of guards needed because of poor design, and inefficient heating. Candor requires the admission that a new prison will obviously involve some added expense. But we are currently pouring money down a rathole.

Accordingly, it appears to me that the next step is for the Department of Corrections to determine whether it is possible to arrange for the lease purchase of the modern prison facility that has already been designed at considerable public expense. Once an appropriate arrangement has been made, it would then be proper to bring a traditional "bond mandamus" in this Court against the Commissioner of Finance and Administration or another appropriate nominal defendant to determine whether such a long-term lease purchase arrangement is legal. At that point the entire Court will have an opportunity to evaluate the competing public policy goals of inconsistent constitutional and statutory provisions and some movement in an appropriate direction may be forthcoming.

I am authorized to say that Justices MILLER and BROTHERTON join in part II of this opinion.

---

1. It has recently been estimated that the total construction cost for a new prison to replace the penitentiary at Moundsville would be $67,561,-600.00. *See Feasibility Study, West Virginia Penitentiary, Executive Summary* submitted to the Joint Committee on Government and Finance of the West Virginia Legislature. As of today the interest rate on adjustable-rate, long-term bonds in West Virginia is 3.7%. Accordingly, the annual interest cost on an issue sufficient to construct a new prison would be only $2,499,780.