625 S.E.2d 334

**STATE of West Virginia ex rel. Daniel L. Sams, et al., Petitioners,**

v.

**COMMISSIONER, WEST VIRGINIA DIVISION OF CORRECTIONS; Executive Director of the Regional Jail and Correctional Facility Authority; and the West Virginia Board of Probation and Parole, Respondents.**

No. 26647.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 11, 2005.

Filed: Nov. 30, 2005.

George Castelle, Esq., Wendy Campbell, Kanawha County Public Defender Office, Charleston, for the Petitioners.

Darrell V. McGraw, Jr., Attorney General, John H. Boothroyd, Assistant Attorney General, Charleston, for the Respondents, West Virginia Division of Corrections and West Virginia Board of Probation and Parole.

Chad M. Cardinal, Charleston, for the Respondent, West Virginia Regional Jail and Correctional Facility Authority.

David Skundor, Mt. Olive, Pro Se Amicus Curiae.

The Opinion of the Court was delivered PER CURIAM.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

PER CURIAM.

■ This Court *sua sponte*[1] issued an order on July 11, 2005, directing that the Respondents file a statement[2] regarding the extent to which each component of the September 20, 2002, Long–Term Plan for Reducing the Number of State Prisoners Held in County and Regional Jails[3] (hereinafter referred to as "Long Term Plan") has been implemented. Following oral argument on this critical issue of overcrowding combined with review of the relevant reports and case history of this protracted matter, we reach the decision that it is the combined responsibility of the Executive and Legislative branches to fulfill the terms of the Long Term Plan. Finding no immediate evidence of conditions that are currently resulting in unconstitutional deprivations[4] to the Peti-

---

1. *See* Syl. Pt. 2, *Crain v. Bordenkircher*, 180 W.Va. 246, 376 S.E.2d 140 (1988) (recognizing jurisdiction over constitutional matters and holding that "[t]his Court has a duty to take such actions as are necessary to protect and guard the Constitution of the United States and the Constitution of the State of West Virginia").

2. Under the terms of the July 11, 2005, order, the statement was required to be filed by August 30, 2005.

3. The plan is the collective agreement and work of the West Virginia Division of Corrections, the Kanawha County Public Defender Office, and the West Virginia Regional Jail and Correctional Facility Authority.

4. As we first recognized in syllabus point two of *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (1982), "[c]ertain conditions of . . . confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution [and Article III, Section 5 of the West Virginia Constitution]."

We do not address in this opinion whether any asserted failure of the respondents or other parties to properly house persons committed to the Division of Corrections deprives those persons of due process of law or results in unconstitutional deprivations other than cruel and unusual punishment.

tioner inmates, we can only urge the other two departments of government to promptly act to address the ongoing issues presented by an ever-burgeoning prison population and to recognize that a failure to act with sufficient alacrity may result in either this Court, or a federal court, being required to intervene in the future.

## I. Factual and Procedural Background

This case had its genesis when six prisoners sought a writ of mandamus to compel their transfer from a regional jail to facilities operated by the West Virginia Division of Corrections ("DOC"). In response to that petition, this Court granted a moulded writ through which we appointed a new special master [5] to oversee the preparation of a long-range plan for the transfer of inmates lodged in regional and county jails awaiting transfer to DOC facilities.[6] *See State ex rel. Sams v. Kirby*, 208 W.Va. 726, 542 S.E.2d 889 (2000). The much-awaited Long Term Plan was finally submitted to this Court on September 20, 2002.

5.  Forrest H. Roles was appointed to replace Patrick McMannis as special master.

·6.  This Court observed in *State ex rel. Dodrill v. Scott*, 177 W.Va. 452, 352 S.E.2d 741 (1986), after noting the "persistent, deplorable problem" of overcrowding, that "[t]he sad part of the whole situation is that neither the Governor nor the Legislature has seen fit to prepare a master plan that can be implemented, even on a piecemeal basis as funds become available." *Id.* at 457, 352 S.E.2d at 746. Despite our recognition of the immediate need for formulation of a plan, "independent of regional concerns and political dictates, that will modernize our penal system for today and for tomorrow," this Court was forced to be the catalyst for the Long Term Plan when the other two branches failed to step up to the plate. *Ibid.*

7.  The Long Term Plan provided for the following with regard to fully funded and approved prison bed construction:
    * completion of Lakin Correctional Center for 360 beds to house female prisoners.
    * completion of St. Mary's Correctional Center for 396 beds to house medium security male prisoners.
    * renovation of Stevens Clinic for 280 beds to house medium and minimum custody male prisoners.
    * renovation of Old Eastern Regional Jail for an additional 120 beds.

In his final report attached to the Long Term Plan, the Special Master opined that "the Plan involves some critical steps which the Parties cannot take except in response to necessary legislat[ive] and executive action which is beyond their control" and notes further that "the question of whether to adopt many of the recommendations is a political one and outside the authority of the Parties to resolve." Notwithstanding these observations on the part of the Special Master, the Long Term Plan does contain specific recommendations for improving the serious bed shortages within the DOC. Among such suggestions were detailed plans for completing or expanding various facilities for the purpose of adding more beds to the state's penal system.[7] Besides the construction of additional beds, the Long Term Plan set forth various options for addressing the bed space issue presented by an expanding prison population. Those various options included three general approaches to the problem. The first suggestion requires the adoption of specific changes to sentencing policies and practices.[8] The second option involves

* expansion of Mt. Olive for an additional 144 beds.
* expansion of Huttonsville facility for an additional 200 beds.

8.  Included as part of this option were the following suggestions:
    * reduction of statutory terms for certain identified crimes such as first degree robbery.
    * creation of specialized board to review prisoners 50 years old and older with long term sentences to determine whether they still present a danger to society.
    * creation of new standards for revocation for parole for technical violations (i.e. not reporting change of address, etc.) to implement intermediate level of sanctions rather than immediate return to prison.
    * development of new policies of Parole Board aimed at liberalizing parole of prisoners who do not pose danger to society.
    * encouragement of probation department creation of alternatives to prison incarceration.
    * encouragement of courts, prosecution and defense counsel to work toward alternative sentencing for non-dangerous offenders.
    * establishment of community-based correctional services as authorized by legislation to create alternatives to prison incarceration.
    * creation of extra good time for appropriate prisoners with opportunities for accumulating such credit for participation in work or education.

the transfer of inmates from this state to neighboring states on a contractual basis. As a final option, the Long Term Plan considered the need to build additional prison beds[9] in fiscal year 2007 if the first two options do not produce the desired result of substantially reducing the number of prisoners currently housed outside the DOC.

After this Court received the Long Term Plan, we issued an order on January 2, 2003, through which we directed that the matter should be revisited by this body after one year. We further ordered at that time the transmittal of that Long Term Plan to both the legislative and executive branches of government for their consideration of the various options identified within the plan for addressing the issue of providing bed space to the state's prison population.

On October 10, 2003, the West Virginia Board of Probation and Parole, was made a party to this matter. This Court further ordered both the Regional Jail and Correctional Facility Authority and the DOC to supply us with reports[10] setting forth updated statistical information pertaining to the backlog of prisoners housed in various regional jail facilities awaiting transfer to DOC facilities. Pursuant to this Court's order of July 11, 2005,[11] the matter was scheduled for oral argument on October 11, 2005, for the purpose of addressing the extent to which the various components of the Long Term Plan had been implemented.

## II. Standard of Review

Because this matter was initially presented to the Court by prisoners seeking extraordinary relief in the form of a writ of mandamus for the purpose of securing their transfer to DOC facilities, we continue to review this matter pursuant to the standard applicable for such procedural matters. As we held in syllabus point three of *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981):

> Before this Court may properly issue a writ of mandamus three elements must coexist: (1) the existence of a clear right in the petitioner to the relief sought; (2) the existence of a legal duty on the part of the respondent to do the thing the petitioner seeks to compel; and (3) the absence of another adequate remedy at law.

Accordingly, the issues presented by this case will be examined pursuant to this well-ensconced standard of review.

## III. Discussion

In the eyes of the prisoners who initiated this petition and their counsel, the implementation of the various options identified within the Long Term Plan for reducing the severe bed shortage situation has been a dismal failure. Statistically, as of August 2005 the backlog of prisoners being housed in regional jails awaiting transfer to DOC facilities is 1511,[12] a number which is significantly higher than the figure of 745 that existed when this litigation commenced. Based on the current backlog, the prisoners report that the regional jails are currently exceeding their capacity by 1181 prisoners. The result of this overcrowding at the regional level is to force inmates to sleep on the floor on mats.

The prisoners maintain that despite the clear solutions identified in the Long Range Plan for reducing the backlog of prisoners improperly housed in regional jail facilities[13]

- identification of appropriate prisoners for sentence commutation.

9. The amount of additional beds that would be constructed pursuant to this option is 1,277, with construction anticipated to be accomplished by the end of 2010.

10. Those reports were initially due on January 12, 2004, but this Court extended the deadline to June 14, 2004. The reports were timely filed with this Court.

11. The Court also directed that the parties file by August 30, 2005, written statements addressing the extent of compliance with options identified

in the Long Term Plan for reducing the backlog of prisoners housed in the regional jails.

12. As of June 30, 2005, this figure was 1286.

13. In mandatory language, West Virginia Code § 62-13-5 (1999) (Repl.Vol.2005) compels:

> All adult persons sentenced by a court to serve a sentence of incarceration in a penitentiary, prison or a correctional institution under the jurisdiction of the Commissioner of Corrections shall be deemed to be sentenced to the custody of the Commissioner of the Division of Corrections. The Commissioner, or his or her designee, has the authority to and may order

the Respondent DOC and Board of Parole "have adopted practices that are among the primary causes for the skyrocketing backlog of prisoners . . .: unreasonably low rates of granting parole, unreasonably high rates of revocation of good time credits and parole, a refusal to award good time, a refusal to identify appropriate candidates for commutation or early release, and a refusal to take almost any significant steps to reduce the number of prisoners in DOC custody." As evidence of a backwards slide in addressing the problem, the prisoners note that the current rate of granting parole is lower than in 2000 when this petition was filed.

In response to the prisoners' claims, the DOC acknowledges the unfavorable increase of prisoners lodged in regional jail facilities but states that "the vast majority of this increase is attributable to delays in construction [14] and a higher number of inmate commitments than was anticipated in the plan." After noting that its admission rate has grown by 33%,[15] the DOC asserts that it is without sufficient resources to resolve the problem on its own. Correctly identifying the problem as one which requires both legislative involvement in terms of obtaining the necessary resources to fund construction and renovation projects and the involvement of the executive branch as far as policy decisions regarding parole and sentencing issues, the DOC observes that "unless West Virginia

decides to radically alter the consequences for criminal activity, . . . additional prison beds are going to have to be made available."

On the issue of parole, the Parole Board indicates that its current grant rate is 37%.[16] Because the Long Term Plan used a rate of 41.5% in calculating future prison populations, this resulted in an additional 240 inmates remaining outside the DOC system based on the plan's projected prison population.[17] The Parole Board explains further that the objective of reducing technical parole violations did not result in creating additional bed space because the projections relied upon did not take into consideration the fact that parole officers were already giving parolees multiple opportunities to comply with the terms of their respective parole agreements, rather than immediately placing them back into the prison system for technical violations.[18]

Once again this Court finds itself in the unenviable position of "continu[ing] to be the forum for the settlement of the rights of prisoners *when it is the duty of the executive and legislative branches of government*" to address these issues. *State ex rel. Dodrill v. Scott*, 177 W.Va. 452, 458, 352 S.E.2d 741, 746 (1986) (emphasis supplied). Over fifteen years ago in *Scott* we addressed the options available to address the overcrowding issues presented at that time:

the transfer of any such adult to any appropriate institution within the Division of Corrections or within the Department of Military Affairs and Public Safety. The Commissioner has full discretionary authority to contract with any county jail, regional jail or other appropriate facility or institution for the incarceration and care of adult inmates.

14. To illustrate, the DOC cites the fact that the anticipated additional beds at St. Mary's Correctional Center have not materialized due to a lack of funding. The use of Lakin, which was supposed to hold 360 women and correspondingly permit Pruntytown to have additional space, has not occurred. Additionally, the Old Eastern Regional Jail intended to open as the Martinsburg Correctional Center and provide 120 beds has not eventualized. The projected available bed space at Huttonsville is 72 beds lower than anticipated. The DOC notes, however, that renovations currently underway at Huttonsville will

provide an additional 200 beds in the next 18 months.

15. The national average is much lower—only 8.5%. The DOC observes that, as opposed to the perception that this state has a low violent crime rate, the reality is that West Virginia is ranked 34th nationally in violent crimes as compared to 47th for overall crimes. Compared to the national average of $100 per citizen cost for operating the state prison systems, West Virginia citizens pay only $34 per capita.

16. This statistic is for the year 2005.

17. Because of increases in the incarceration rates, however, the Parole Board states that the actual number of prison beds affected by the decreased percentage of parole granting is 370.

18. The Parole Board argues that contrary to the contention of the prisoners, West Virginia does not mete out harsher punishments compared to neighboring states.

Our statutory scheme thus not only contemplates, but mandates, a system in which convicts sentenced to the penitentiary are received by the Department of Corrections and incarcerated in a State penal facility. As a result of the current condition of our state prisons, obedience to this statutory scheme leads inexorably to unconstitutional overcrowding. The safety valve on the system, however, is the Governor's power of reprieve, pardon and parole set forth in *W.Va. Const.* art. 7, § 11 and *W.Va.Code* 5–1–16 [1923]. Convicts must be accepted by the State for incarceration; but to bring our overcrowded prisons into constitutional compliance, *the Governor may pardon, parole, transfer, or otherwise make constitutional accommodations for those convicts already incarcerated.* This leads to socially undesirable consequences. Nevertheless, *until the legislature either amends the statutory scheme of sentencing and commitment or appropriates the funds necessary to provide constitutional accommodations for all incarcerated convicts, it is the only permissible course of action open to the Governor.*

177 W.Va. at 457, 352 S.E.2d at 745 (emphasis supplied).

■ Years later in *State ex rel. Smith v. Skaff,* 187 W.Va. 651, 420 S.E.2d 922 (1992), when addressing the non-appearance of a new prison whose construction had been mandated by this Court,[19] we acknowledged both the unfairness and the illegality of housing inmates outside of the DOC. As we stated,

it is extremely unfair for the Division of Corrections to shuffle this problem onto the county and regional jails. Not only are these facilities in no better position to cope with this problem in view of their own fiscal limitations with all the overcrowding and understaffing problems attendant

thereto, *but it simply is not their responsibility under the law.*

*Id.* at 655, 420 S.E.2d at 926 (emphasis supplied). Accordingly, we held that:

The statutory scheme of this state places a nondiscretionary duty upon the Division of Corrections to incarcerate those inmates who are sentenced to the penitentiary in a state penal facility operated by the Division of Corrections. Hence, the Division of Corrections is prohibited from lodging inmates in a county or regional jail facility absent the availability of space in these facilities once the inmates have been sentenced to a Division of Corrections facility.

*Skaff,* 187 W.Va. at 652, 420 S.E.2d at 923, syl. pt. 1.

Despite this Court's continuing recognition of this pressing issue and multiple directives from this body to remedy the problem, the problem of housing inmates outside the DOC remains. *See Sams,* 208 W.Va. at 730, 542 S.E.2d at 893 (recognizing in 2000 that "we are still faced with DOC inmates confined to jails that were not designed for incarcerating a prisoner for an extended time").

■ The hard policy decisions demanded by the existence of penal institutions that are at capacity levels with a lengthy list of prisoners awaiting housing should, in the first instance, be made by the executive and legislative branches.[20] The role of the judicial branch at this juncture remains largely hortatory until violations rise to the level of unconstitutionality. *See Dodrill,* 177 W.Va. at 461, 352 S.E.2d at 749 (Neely, J., dissenting) (observing that "[s]peech making and hortatory language do not build new prisons: money builds new prisons" and lamenting that the Supreme Court "remain[s] a disembodied voice crying in the wilderness" with regard to correctional reforms). Nonetheless, we are compelled to remind the executive and legislative branches of government that action is required to address this con-

**19.** *See Crain v. Bordenkircher,* 180 W.Va. 246, 376 S.E.2d 140 (1988) (mandating that DOC construct new prison facility by July 1, 1992).

**20.** We recognize that the judicial branch is significantly involved in determining jail and prison populations because our magistrate and circuit courts make sentencing decisions daily. Howev-

er, the length of sentences, their enhancement by reason of particular defined circumstances and the availability of alternatives to incarceration are all defined by the Legislature and administered—except for probation—by legislative and executive officials at the state and local level.

tinuing and most serious problem of housing inmates outside the DOC system to which they have been committed.[21] Our present inclination to defer to those two branches should not be read as limitless patience with continuing violation of the statutory law of the state requiring state prisoners to be housed in Department of Corrections facilities and proven violations of regulations establishing minimum bunking or space standards for prisoners. *See* Syl. Pt. 4, *State ex rel. Berry v. McBride*, 218 W.Va. 579, 625 S.E.2d 341, No. 30696 (filed November 30, 2005) (holding that "[t]he constitutional principles of equal protection and due process of law, *W.Va. Const.* art. 3, § 10, require that decisions regarding whether an inmate in a State correctional facility should be housed in a single cell must be made pursuant to enforceable standards, policies, and procedures that are based on pertinent medical and other relevant criteria").

Because the long-term resolution of the prisoner population issues entails legislative and executive initiatives rather than judicial ones—issues like defining appropriate sentences, providing alternatives to incarceration, "good time" reforms, parole granting policies,[22] and additional prison construction if appropriate—it is far preferable for this Court to extend to the executive and legislative branches clear and definite opportunities to formulate these policies without premature judicial involvement. We commend to our sister branches the Long Term Plan developed by the executive offices having direct responsibility for these policies. We call upon the leadership of the executive and legislative branches not to allow these problems to go unaddressed and not to allow those directly responsible for the implementation of such policies to avoid the resolution of the problems identified herein solely by reason of inertia.

Because we do not find evidence of current unconstitutional deprivations associated with the housing of inmates admitted to the DOC but housed outside the DOC, we cannot issue a writ of mandamus. *See, Cooper,* 171 W.Va. at 248, 298 S.E.2d at 784, syl. pt. 3. We do, however, urge the executive and legislative

---

**21.** One theory on why change is slow to come in this area has been posed:

[P]arole boards lack a mandate from the public and thus our elected officials to reform parole decisionmaking. The neverending and insatiable demand for higher incarceration rates and longer prison terms diverts any attempt to introduce more reasonable and cost-effective correctional policies and legislation.

Austin, *infra, An Overview of Corrections,* ch. 2, p. 17, *A Handbook for New Parole Board Members.*

**22.** In trying to identify solutions to the problem of housing an ever increasing prison population, one authority has compiled the following recommendations for state parole officers to use in reshaping current practices and policies that could aid in helping to reduce the costs of incarceration without jeopardizing public safety:

1. The most effective and practical reforms that can be easily implemented under current state laws will focus on reducing the lengths of stay for low risk prisoners as well as the nature of parole supervision. Those states that have abolished discretionary release should re-examine that decision and seek to reinstate indeterminate sentencing with discretionary release—especially for long term prisoners.
2. The first priority for any state is to design and implement "risk based" guidelines that will help parole boards determine who should be released and when. These guidelines should include so called "dynamic factors" that take into account the prisoner's behavior and accomplishments while incarcerated which have been shown to suppress future criminal behavior.
3. Parole boards must ensure that prisoners released on parole who are judged to be high risk receive close supervision and services. Conversely, low risk parolees should be paroled at their initial eligibility dates and have a reduced period of minimal supervision so that parole supervision caseloads can be reduced.
4. The nature and length of parole supervision needs to be re-examined. In many jurisdictions, the length of supervision is excessive which often results in parolees [who] requir[e] high levels of supervision and services not receiving them.
5. The parole revocation process should be limited so that parolees cannot easily be returned to prison for misdemeanor level crimes or non-criminal behavior. Prisons are intended for persons convicted of serious felony crimes.
6. Parole boards should also ensure that parole decisionmaking criteria and the revocation process are applied uniformly by the board.

James Austin, *An Overview of Corrections and Criminal Justice—Reshaping Parole,* in *A Handbook for New Parole Board Members,* ch. 2, p. 20, (Peggy Burke, ed., Assoc. of Paroling Authorities Int'l and Nat'l Inst. of Corrections, 2003).

branches to undertake serious review of their respective roles and responsibilities for contributing to the current housing situation and to act with alacrity, to avoid the day when we or the federal courts are forced to intervene.

Writ denied.

STARCHER, J., concurring.

I concur in the Court's opinion and judgment. I write separately for two reasons.

First, I wish to point out that footnote 4 of this Court's opinion limits the scope of the opinion to deciding whether the current overcrowding in West Virginia's jail system today constitutes "cruel and unusual punishment."

I am willing to accept—for today—that it does not.

But I do not concede that the "go slow" approach of the Division of Corrections, *et al.* is otherwise legal or constitutional.

The constitutional requirements of due process of law and equal protection require that people sentenced to prison get the benefits of prison sentences, as well as the hardships. Corrections has agreed to a plan, and they have a legal duty to carry out that plan—aside from their duty not to impose cruel or unusual punishment. The petitioners have other legal arrows in their quiver, I think, and they are not foreclosed by this Court's opinion from using them.

I also note that footnote 20 does not preclude this Court from mandating that the jail system conduct risk reviews and assessments for all convicted persons, especially nonviolent offenders; and offer alternative sentence proposals to the circuit courts. And nothing in the majority opinion precludes this Court from requiring our circuit judges to give consideration to those assessments and reviews.

Accordingly, I concur.