483 S.E.2d 1

**STATE of West Virginia ex rel. Judson WHITE, Petitioner,**

v.

**Larry F. PARSONS, Administrator, South Central Regional Jail, Respondent.**

No. 23542.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 10, 1996.

Decided Dec. 9, 1996.

Rehearing Refused Feb. 11, 1997.

Matthew A. Victor, Charleston, for Petitioner.

Chad M. Cardinal, Assistant Attorney General, Charleston, for Respondent.

ALBRIGHT, Justice:

On June 3, 1996, an absolute ban against the possession or use of tobacco by inmates was put into effect at the South Central Regional Jail, located at Charleston, West Virginia, under the authority of legislative rules promulgated by the Jail and Correctional Facility Standards Commission. The petitioner, Judson White, was a pretrial detainee at the jail, who petitioned this Court[1] *pro se* for relief from the tobacco ban. This Court granted a rule to show cause why a writ of prohibition should not issue and appointed counsel to represent petitioner. After hearing oral arguments, the Court further ordered respondent to file with the Court "any documentation available regard-

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

ing the promulgation" of the underlying anti-tobacco regulations and ordered additional briefs from the parties. After consideration of the petition, the oral arguments, the briefs of the parties, and the documentation filed, we award a moulded writ.

## FACTS

On March 25, 1994, respondent, the Administrator of the South Central Regional Jail, announced that all tobacco use at the South Central Regional Jail (The SCRJ) would be eliminated by June 1, 1994. Tobacco use was to be phased out under a schedule put in place April 1, 1994. Richard Kincaid, an inmate at the SCRJ, filed a petition for injunctive relief prohibiting enforcement of the Administrator's tobacco ban, and this Court, treating the matter as a habeas corpus petition, awarded a moulded writ in *State ex rel. Kincaid v. Parsons,* 191 W.Va. 608, 447 S.E.2d 543 (1994).

In its opinion, the *Kincaid* Court found that a total ban on the use of tobacco amounted to a legislative rule that "cannot be left to the sole discretion of the administrator of one regional jail; rather, the State Administrative Procedures Act (APA)[2] and W.Va. Code § 30-20-9 dictate that any legislative rule of this nature must be promulgated pursuant to the APA's formal rule-making process." This Court said further:

> Smoking is a valuable privilege that has been afforded inmates since the inception of the prison system.... Although the right to smoke probably does not rise to the level of a State constitutional right in a prison context, it is clearly a customary right that has arisen over centuries notwithstanding the valiant efforts of both puritans and public health advocates. Thus, before being deprived of such a long-standing and customary right, the petitioner and others similarly situated are clearly entitled to certain procedural safeguards. Among procedural safeguards is the simple

requirement that the respondents comply with the rule-making provisions of *W.Va. Code* 31-20-5 [1994] and the APA, and provide for public comment and legislative review before a final rule is adopted.

*State ex rel. Kincaid v. Parsons,* 191 W.Va. 608, 611, 447 S.E.2d 543, 545-46 (1994).

On June 30, 1995, the Jail and Correctional Facility Standards Commission[3] (Standards Commission), filed notices in the State Register proposing 95 C.S.R. 1, Minimum Standards for the Construction, Operation and Maintenance of Jails, and proposing 95 C.S.R. 2, Minimum Standards for Construction, Operation and Maintenance of Correctional Facilities. The notices were published in the July 7, 1995 periodic report of State Register filings, with copies of the proposed regulations. The proposed regulations each contained sections imposing absolute tobacco bans on inmates in regional jails but the correctional facility regulation proposed to allow the chief executive officer of most correctional facilities to permit inmates to possess and use tobacco in designated areas. Both notices limited public comment to written statements to be submitted to the Standards Commission by July 31, 1995. According to the documentation regarding the promulgation of these rules, filed here on behalf of respondent by the Attorney General pursuant to our order in this action, the Standards Commission met on July 31, 1995, made the comments received a part of the record, and proceeded to approve the proposed regulations, with minor changes, for submission to the Legislature for review and approval. That documentation filed here by the Attorney General consisted of the minutes of two meetings of the Standards Commission, held July 23 and July 31, 1995, the written comments on the proposed regulations received during the comment period, and the minutes of the meeting of the legis-

---

2. W.Va.Code § 29A-1-1 *et seq.*

3. The Standards Commission was created by the provisions of W.V.Code § 31-20-8 (1989). The powers and duties of the commission are set forth in W.Va.Code § 31-20-9 (1993) and include the power to promulgate rules under the

APA, to implement the provisions of W.Va.Code § 30-20-1, *et seq.* One of the powers of the commission, set forth in W.Va.Code § 31-20-9 is to "[p]rescribe standards for the maintenance and operation of correctional facilities and county and regional jails."

lative rule-making review committee[4] at which the proposed regulations were submitted to the full Legislature for approval.

The favorable comments contained in the documentation consisted of letters submitted by three offices in the Department of Health and Human Resources (the Commissioner of the Bureau for Public Health, the Program Manager of the Tobacco Control Program and the Director of the Division of Respiratory Disease Studies), submitted by a Charleston physician, and submitted by the chair of a public interest group opposed to the use of tobacco. These comments eloquently addressed the serious health concerns and hazards of tobacco use, including the dangers to tobacco users and those who must live or work with tobacco users and offered technical assistance for implementation of a tobacco ban, including possible assistance to those tobacco users who would be affected by the ban.

The documentation reveals that only one negative comment was submitted. The Commissioner of Corrections objected to provisions of the proposed regulations imposing the absolute tobacco ban at facilities operated jointly by the Regional Jail Authority and the Division of Corrections. The Commissioner asserted that the ban was "contrary to Corrections' philosophy and, unfortunately was composed without regard to, or consultation with, Division of Corrections' policies and administrators." The Commissioner advised further that:

"Corrections' position is that prohibition of *any* tobacco use for persons serving sentences of many years, up to and including life, is an arbitrary and capricious exercise of administrative authority which serves no reasonable management purpose. Sanitation issues are already handled by operational regulations and health concerns are best dealt with through education, not this ill-conceived approach.

The record of the July 31, 1995 meeting of the Standards Commission discloses that the comments submitted by the Commissioner of Corrections particularly addressed a situa-

tion unique to the Northern Regional Jail, where separate sections of the jail house only prisoners in the custody of the Division of Corrections and other sections of the jail house only prisoners committed to the custody of the Regional Jail and Correctional Facility Authority. Thus, as we understand the record, the Northern Regional Jail is considered to be "operated jointly" by the Authority and the Division of Corrections, and the remainder of the regional jails are operated by the Regional Jail and Correctional Facility Authority. During the July 31, 1995 meeting, the Commissioner of Corrections was heard further with respect to his written comments, and his concerns were discussed briefly. It appears from the record of that discussion, that the effect of the regulations under consideration was to require the Division of Corrections to treat its prisoners at the Northern Regional Jail differently with respect to the possession and use of tobacco than it might treat its prisoners housed elsewhere.

Notwithstanding the objections of the Commissioner, the regulations were approved without material change and forwarded by the Standards Commission to the Legislature for review. In due course, the Legislature authorized their promulgation[5] without change. The final regulations were filed in the State Register March 27, 1996, to be effective June 3, 1996.

We quote the pertinent parts of the two regulations, as finally promulgated. 95 C.S.R. 1–10.1, relating to regional jails, reads as follows:

§ 95–1–10. Sanitation and Hygiene.

10.1. Responsibility. Jail facility authorities shall maintain the facility in a condition that is clean, healthful and sanitary and which conforms to all applicable health laws and rules. The use and possession of tobacco, tobacco products and tobacco-like products shall be prohibited in all jail facilities and all facilities jointly operated by the Regional Jail & Correctional Facility Authority and the Division of Corrections.

---

**4.** The legislative rule-making review committee was created by W.Va.Code § 29A–3–10 (1989).

**5.** W.Va.Code § 64–6–1 (1996).

95 C.S.R. 2–13.1, relating to correctional facilities under the control of the Division of Corrections, reads as follows:

§ 95–2–13. Sanitation and Hygiene.

13.1. Responsibility. Correctional facility authorities shall maintain the facility in a condition that is clean, healthful and sanitary, and which conforms to all applicable health laws and rules. The use and possession of tobacco, tobacco products and tobacco-like products is prohibited in all facilities jointly operated by the Regional Jail and Correctional Facility Authority and the Division of Corrections, and may be permitted in designated areas of correctional facilities operated exclusively by the Division of Corrections at the discretion of the correctional facility's Chief Executive Officer.

To initiate compliance with the Jail Authority rule, the Executive Director of the Regional Jail and Correctional Facility Authority issued Policy and Procedure Statement B–2–001 on April 4, 1996, which outlined plans for the implementation of the tobacco ban in the regional jails on a phase-out schedule, allowing the absolute ban to be in place as early as June 3, 1996, the effective date of the regulations. The policy states:

The use of tobacco and tobacco products is prohibited within all buildings and vehicles under the control of the West Virginia Regional Jail and Correctional Facility Authority. The use and possession of tobacco, tobacco products and tobacco-like products, by inmates, is prohibited in all Authority facilities and vehicles.

In part, the statement also provides:

2. Accommodations may be made outside the facility for tobacco use by employees or visitors to the facility. Such areas shall be designated as a "Tobacco Use Area" and shall be situated so that a tobacco free environment is maintained within the facility. Employees may use tobacco during normally scheduled break periods is [sic] such areas.

3. No employee may use tobacco in the presence of inmates.

On April 5, 1996, respondent, Larry Parsons, Administrator of the SCRJ, distributed to all inmates a memorandum which adopted a phase-out schedule designed to accomplish the absolute ban on the June 3, 1996 effective date of the regulations, by reducing tobacco availability and use in stages prior to that date. The memorandum announced that inmates would be provided with information pamphlets, that assistance would be solicited from the American Cancer Society and the American Lung Association, and that the counseling and medical staff of the SCRJ would be available to assist those who had difficulty giving up the use of tobacco.

On April 19, 1996, petitioner, inmate Judson White, filed the petition presently before us which, as noted above, has matured for disposition.

Respondent argues that there is no "constitutional right to use tobacco in jail" and that because the regulation challenged is related to legitimate governmental interests, this Court must sustain it. Respondent argues further that the regulations are sustainable as reasonably related to the legitimate governmental interests of protecting inmates' health and welfare, protecting the facilities and the equipment in them from damage or deterioration, and providing adequate sanitation in the jails. Respondent also argues that the Standards Commission was not required to seek a less restrictive alternative to the regulations, because the alternatives are impractical or expensive and the jail administrators must be given great deference on such operational and security issues as a ban on smoking.

Petitioner presses no "constitutional right" to use tobacco and concedes that smoking is bad for one's health. However, petitioner argues, the regional jail regulation is unreasonable as unduly stringent and that it unreasonably impacts him as a mere pretrial detainee, rather than one convicted of a crime. He seeks limited "tobacco use areas" indoors and smoking privileges outside, analogous in the latter instance to those available to the employees of the jail. He asserts that the use of tobacco is not itself illegal and can be accommodated in the jail facilities. Petitioner also complains that he was not afforded procedural due process in the development of the regulations. Acknowledging that

**6**

the Standards Commission may have formally adhered to the mandates of procedural due process imposed by this Court in *Kincaid* in the promulgation of the regulations, petitioner asserts that there was no visible input in the process by persons having an interest in the proceedings, particularly the inmates. He argues, in effect, that there is no rational basis for absolutely forbidding the use of tobacco by pretrial detainees. He contends that reasonable accommodation is at the core of this case.

■ Since petitioner does not press a "constitutional right to smoke", we will not decide that issue here. We do note the decision of the United States Supreme Court declaring that an inmate stated a cause of action by alleging that he was exposed to an unreasonable health risk when, *with the deliberate indifference of prison officials,* he was exposed to high levels of environmental tobacco smoke. *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). As that decision clearly indicates, prison officials may not be indifferent to the desire of inmates to avoid concentrations of so-called "second hand smoke". It follows that it is incumbent upon the Standards Commission to give full consideration to how the legitimate interests of such inmates may be reasonably accommodated.

We likewise concur with respondent that some courts have upheld absolute bans on tobacco products for inmates, even though tobacco use by employees of the correctional facility involved is permitted in designated areas.

One such case cited by respondent is *Reynolds v. Bucks,* 833 F.Supp. 518 (E.D.Pa. 1993). There, inmates brought an action against prison officials to challenge a smoking ban. The federal district court held that the ban was constitutional. The court said that the fact that employees could smoke, but

inmates could not, does not suggest that the intent of the ban was punishment. The Court enumerated legitimate reasons to distinguish between the treatment of employees and prisoners:

> First, there are far fewer employees than prisoners. Moreover, the prison authorities are responsible for the health of inmates under their supervision to a greater extent than they are for their employees. It is also reasonable for defendants to conclude that employees can be trusted to smoke with greater care for safety and sanitation hazards and without damaging property and equipment.

833 F.Supp. at 520.

Other courts have reached the same result on like or other grounds, and still other decisions have upheld partial tobacco bans, limiting use and possession by inmates to designated places and times.[6]

Respondent's argument here is based on a universally accepted thesis regarding the proper limits on the judicial examination of jail and prison rules and management practices:

> Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights—a retraction justified by the considerations underlying a penal system. These constraints on inmates are necessary to accommodate a myriad of institutional needs and objectives of prison facilities and serve incidentally as reminders that under the justice system deterrence and retribution are factors in addition to correction. A court must assess challenges to prison regulations based on asserted constitutional rights of prisoners in light of the legitimate objectives of deterrence of crime, rehabilitation of inmates, and internal security within corrections facilities.

---

6. Cases where absolute or partial bans have been upheld include *Doughty v. Board of County Commissioners for County of Weld,* 731 F.Supp. 423 (D.Colo.1989) (smoking ban in jail did not constitute cruel and unusual punishment); *Stanfield v. Hay,* 849 S.W.2d 551 (Ky.App.1992) (smoking ban in county jail was not punishment and did not violate due process); *Jarrett v. Westchester Co. Dept. Of Health,* 169 Misc.2d 320, 646 N.Y.S.2d 223 (N.Y.Sup.1996) (there is no constitutional right to smoke in jail); *Grass v. Sargent,* 903 F.2d 1206 (8th Cir.1990) (inmate's constitutional rights were not violated when smoking was prohibited in prison visitation area during visiting hours); *Shockey v. Winfield,* 97 Ohio App.3d 409, 646 N.E.2d 911 (1994) (inmates were prohibited from smoking in residential areas of prison).

60 Am.Jur.2d, Penal & Correctional Institutions § 27 (footnotes omitted) (1987).

In recognition of this thesis, we find that courts have only intruded into the field of prison or jail management to protect readily identifiable constitutional rights and often only to provide minimal guarantees of those rights or to give protection from their arbitrary or capricious denial to incarcerated persons. One of the rights recognized—and often severely restricted by prison rules—is the right to some periods and forms of exercise and recreation.

For instance, in *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir.1980), inmates in the county jail were kept in their cells twenty-four hours a day and released three times per week for fifteen to thirty minutes for showers and exercise. A class of inmates brought an action to complain about this limitation, as well as other conditions in the jail. The Eighth Circuit Court of Appeals held that inmates confined to cells more than sixteen hours per day should be given the opportunity to exercise at least one hour per day outside the cell. The court did not consider walking a narrow corridor between cells to be adequate exercise.[7]

Among the concerns raised by petitioner here is that the regulations under discussion unreasonably deny him a particular recreational privilege that, as *Kincaid v. Parsons, supra*, recites, has "a long history of recognition in the jails and prisons of this State", that he was not afforded procedural due process in the development of the regulations, that he and persons similarly situated had no

real opportunity to be heard, that his use of tobacco can be accommodated, and that being a pretrial detainee and not a convict, the application of the regulations to him is yet more suspect.

We find merit in these arguments, not in terms of a constitutional right of inmates to use tobacco, but in the failure of the rule-making process to accord adequate attention to the genuine issues they address.[8]

■ Our Administrative Procedures Act[9] is silent as to what matters must be addressed by an administrative rule-making proceeding beyond the matter of notice and an opportunity for public comment. In *Kincaid*, we said that "the petitioners and others similarly situated are clearly entitled to certain procedural safeguards." *Kincaid*, 191 W.Va. at 611, 447 S.E.2d at 546. We stated that one such safeguard was compliance with the statutory rule-making requirements, but we did not detail others. In light of petitioner's assertions that he has yet to have such safeguards, we have carefully reviewed the record before us to ascertain if the rule-making process here met standards of fundamental fairness and find the process deficient.

The State Administrative Procedures Act requires the publication in the State Register of a notice of any proposed rule, with a hearing or written comment period. W.Va. Code § 29A–3–5 (1995). It also allows the agency proposing the rule to advertise its hearing or comment period. We note that the Standards Commission met the bare requirements of this statute, but nothing in the

7. Other courts have dealt with similar "recreation" questions: *Levier v. State,* 209 Kan. 442, 497 P.2d 265 (1972) (one of the rights a prisoner retains is the reasonable opportunity for physical exercise); *Sinclair v. Henderson,* 331 F.Supp. 1123 (E.D.La.1971) (confinement of death row inmates for long periods of time without the opportunity for regular outdoor exercise constitutes cruel and unusual punishment); *Mitchell v. Rice,* 954 F.2d 187 (4th Cir.1992) (per curiam), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992) (depriving prisoners of out-of-cell exercise opportunities for extended periods of time might constitute cruel and unusual punishment absent exceptional circumstances); *Housley v. Dodson,* 41 F.3d 597 (10th Cir.1994) (complaint was sufficient to state a civil rights claim when inmate was allowed only thirty min-

utes of out-of-cell exercise during a three-month period).

8. While declining to reach the constitutional issue of a "right to smoke", we note that this State has experience with attempting the absolute prohibition of the use of alcoholic beverages by all citizens, a substance deemed also to have high social costs and, in many situations, demonstrably harmful effects with respect to users, those close to them, and society generally. *See* Art. 6, § 46, W.Va. Constitution and its former provisions contained in Senate Joint Resolution No. 6, Acts of the Legislature, 1911, p. 289, in effect from 1914 to 1934.

9. W.Va.Code § 29A–1–1, *et seq.*

documentation demonstrates that any effort was made to advertise the notice and comment period to interested persons possibly adversely affected by this rule. On the other hand, the record discloses that, at least in one instance, the agency invited favorable comments by the simple expedient of the Deputy Director of the West Virginia Regional Jail and Correctional Facility Authority telephoning the Commissioner of the Bureau of Health and requesting comment.

Next, we note that the agency limited its hearing to written comment, but at its July 31, 1995 meeting, where the comments were made a part of the record, respondent was present and actively participated by commenting that he decided to make The SCRJ smoke-free in 1994. He discussed the early hostility to the new rule, as well as the assistance provided to help break the habit and the sanitary and health benefits attained by making the facility smoke free.[10] We recognize that the agency may and should seek the expertise of jail administrators in the formulation of its policies, but we also recognize that respondent was and is a strong advocate of the absolute tobacco ban. His oral comments recorded at the hearing and his prompt enforcement of the ban, beginning in stages within days after legislative approval of the regulations and literally one day after publication of the policy bulletin anticipating the effective date of the regulations, confirm his intense interest in the issue.

We concur with the view expressed by the Supreme Court of New Jersey, that any administrative agency is limited by principles of fundamental fairness. *State Department of Environmental Protection v. Stavola,* 103 N.J. 425, 511 A.2d 622 (1986). We also agree with the Supreme Court of Wisconsin, where the court said that "[t]he cardinal test of the presence or absence of 'due process' of law in an administrative proceeding is the presence or absence of the rudiments of fair play long known to law." *Mid–Plains Telephone, Inc. v. Public Service*

*Commission,* 56 Wis.2d 780, 787, 202 N.W.2d 907, 911 (1973).[11] It is sufficient to say here that the failure of the agency to make any special effort to solicit any comments other than favorable ones, that the failure to contact any adversely affected parties other than by the formal notice filed in the State Register, and the taking of oral comments on July 31, 1995, when a hearing had been limited to written ones, raises a suggestion of unfairness which demonstrates the need for further inquiry into this rule-making process.

It has been said than an administrative agency must consider the views of interested persons in its rule-making process. *Vega v. National Union Fire Ins. Co.,* 67 Haw. 148, 682 P.2d 73 (1984). In *Hedge v. Lyng,* 689 F.Supp. 884 (D.Minn.1987), the court quoted from *Levesque v. Block,* 723 F.2d 175 (1st Cir.1983), by stating that interested persons have a right to make their views known to an agency in time to influence the rule-making process in a meaningful way. In *Western Oil and Gas Association v. Air Resources Board,* 37 Cal.3d 502, 208 Cal.Rptr. 850, 691 P.2d 606 (1984), the Supreme Court of California was discussing a statutory interpretation regarding local and regional boards. The court said, "[a]doption of local enforcement regulations must be preceded by public hearings at which all interested persons are afforded the opportunity to make written and oral presentations which the district is obligated to consider." *Id.* at 524, 208 Cal.Rptr. at 863, 691 P.2d at 619. Here, although the vast majority of interested persons might have been reached by a notice to users then at a score of locations around the State, the agency failed to make any specific effort to solicit those views. As a consequence, it received only one negative comment—from the Commissioner of the Division of Corrections, who is also an ex officio member of the Standards Commission.[12]

While we decline to define specific requirements for fundamental fairness applicable to our agency rule-making processes,

---

**10.** We note that the respondent is not a member of the Standards Commission.

**11.** *See also City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa.Super. 391, 90

A.2d 850 (1952) (administrative action cannot violate fundamental principles of fairness).

**12.** W.Va.Code § 31–20–8 (1989).

we suggest to the Standards Commission that: (1) when the agency is aware that a proposed regulation will be viewed adversely by a substantial number of affected persons, it will enhance the rule-making process to make a reasonable effort to solicit views on both side of the question; (2) when the statutorily required hearing for rule-making is limited to written comment, fundamental fairness suggests that limitation should be observed in most circumstances; and (3) if an agency undertakes to particularly solicit views on one side of a contested issue, fairness will be served by a reasonable effort to solicit contrary views. We have not attempted to exhaust the subject of fundamental fairness. We offer these comments only in light of the record before us in contemplation of this well-stated principle:

> When specific parties are particularly affected by a proposed rule, fair play and administrative due process dictate that an agency must conscientiously concern itself with and make reasonable efforts to accommodate the rights and interests of the affected individual and genuinely account for the individualized effect of its proposed action.

*Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85 N.J. 325, 345, 426 A.2d 1000, 1010 (1981) (Handler, J., concurring).

Of greater moment is the Commission's apparent reluctance to benefit from the expertise offered to it by the Commissioner of the Division of Corrections. This Court believes that the Standards Commission should have been concerned by the issues raised by the Commissioner of Corrections when he asserted that the regulations under discussion were arbitrary and capricious and served no reasonable management purpose. Likewise, we would expect concern about the apparently disparate effect of the regulations on facilities housing only prisoners in the custody of the Division of Corrections but jointly operated by the Division of Corrections and the Jail Authority and on facilities housing such prisoners but operated solely by the Department of Corrections.

We have observed that "regulations must not be arbitrary or unreasonable...." Syl. pt. 5, in part, *State ex rel. Sheppe v. W.Va. Board of Dental Examiners*, 147 W.Va. 473, 128 S.E.2d 620 (1962); *Anderson & Anderson Contractors, Inc. v. Latimer*, 162 W.Va. 803, 257 S.E.2d 878 (1979); 60 *Am. Jur.2d*, Administrative Law § 126 (1962). The regulations at issue here were proposed and eventually promulgated under a broad grant of statutory authority to the Standards Commission to prescribe standards for the maintenance and operation of jails and correctional facilities. Specific subjects mentioned in the enabling statute include "lighting and ventilation", "fire protection equipment and procedures", "sanitation", "safety and hygiene", "appropriate medical ... and other health services" and "inmate rules and discipline". As promulgated, the Standards Commission has denominated the smoking ban regulations as related only to sanitation and personal hygiene.

In the documentation filed on behalf of respondent, reflecting factors considered by the Commission after the comment period, it appears that the Commission was advised that no court had been found to have declared smoking a constitutionally protected "right." It also appears that the Commission was presented with some statistical and more anecdotal evidence in support of the regulations addressing such matters as health concerns for the inmates caused by smoking and by tobacco withdrawal, ventilation, cleanliness, fire prevention or avoidance, avoidance of second hand smoke, and the cost and difficulty of providing tobacco use areas.

Unfortunately, it further appears that the objections of the Commissioner of Corrections—including objections that the regulations were arbitrary and capricious and serve no management purpose—were summarily rejected without even an inquiry of him regarding his assertions that the regulations are "contrary to corrections' philosophy", why the regulations are "arbitrary and capricious", why the regulations "serve no reasonable management purposes", or "how the sanitation issues are handled" by Corrections. In short, the agency refused to give fair consideration to the objections of the Commissioner and gave no consideration to

objections, such as those before us now, from adversely affected persons.[13]

We believe that the Commissioner's substantial objections deserved fair consideration, especially in light of the fact that such considerations may have led to some major changes in them. However, the record in the case before us confirms that the expertise of the Division of Corrections was ignored.[14] We believe also that with only minimal additional effort the agency could have had before it the written concerns of a representative selection of inmates—including pretrial detainees and those serving sentences.

We note that the Standards Commission had before it a substantial conflict in opinion between the advocates of the regulations and the chief officer for prison management in the State. Moreover, according to the record of the meeting July 31, 1995, and the comments filed, the Commission was relying largely on anecdotal evidence. The agency was in the process of making a substantial and, with respect to regional jails, absolute, change in "inmate rules and discipline". Against that background, the Commission sought no outside advice and proceeded with only scant attention to the only negative voice present or otherwise appearing on the record. Moreover, there was virtually no attention given to "inmate rules and discipline", a facet of the Standards Commissions' charge directly affected by the proposed regulation. In light of the fact that the regulations proposed to abolish a "customary right that has arisen over the centuries", we find the failure to explore this complex subject, in light of the apparently well-founded professional objections presented to the agency, to be arbitrary and capricious.

We hold that, in a rule-making procedure, when an agency has before it substantial objections to the proposal made by interested persons, as a result of a comment period or hearing precedent to the approval of a regulation, the agency must conduct a good faith review of those objections and reflect the substance of that review on the rule-making record. Since we find no meaningful review of the objections before the Commission when these regulations were adopted and little or no attention to their impact on inmate rules and discipline, we will issue a moulded writ prohibiting their enforcement. The Standards Commission remains authorized to propose such replacement regulations as it deems appropriate.

In considering objections of the kind raised by the petitioner here and others similarly situated, and raised by the Commissioner of the Division of Corrections and other jail and prison authorities who may agree with him, we commend to the Standards Commission the standards discussed by the United States Supreme Court in a somewhat different context *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Discussing there the impact of regulations raising questions relating to constitutionally protected rights in a prison context, the Court applied tests which we commend to the Standards Commission. The Court found one of the regulations, imposing nearly a complete ban on inmate marriages, unnecessarily sweeping. The Court reviewed the regulations to determine if either was arbitrary and capricious or applied in an arbitrary and capricious manner. The Court characterized the regulation as more restrictive than reasonable and essential. Finally, the Court established the principle that prison regulations affecting constitutional rights had to be reasonably related to legitimate penological objectives.

In its consideration of any regulations designed to replace those we are setting aside today, we respectfully suggest that the Standards Commission should consider their impact on inmates. We likewise believe that the Standards Commission will be well served by evidencing informed concern for legitimate penological objectives. We are aware that the Commission is assigned a broad spectrum of subjects on which it is

---

**13.** We do not suggest that an agency is confined to the record made in the comment period or that an agency cannot rely on its own expertise; on the contrary, the agency is fully entitled to consider its own expertise and preferences.

**14.** We have only the documentation provided to us by the Attorney General, which we presume is complete.

asked to provide necessary regulations for the management of jails and correctional facilities and that inmate rules and discipline and inmate rights are but two of those subjects. However, attention to the standards suggested by the Supreme Court of the United States, reviewed above, may be helpful to the Commission when it is considering regulations that touch on inmate rules and discipline and inmate rights.

In addition to the failure to adequately consider substantial objections received during the comment period, we note that the Standards Commission failed to consider whether different standards ought to apply to pretrial detainees with respect to the use and possession of tobacco, as to either a total ban or a different level of recreational opportunity.

■ We also note that 95 C.S.R. 2 purports to confer on the chief executive officer of each correctional facility unfettered discretion to permit or prohibit the use and possession of tobacco in designated areas at the facility under his control. We see no material distinction between that delegation of authority and the exercise of authority we rejected in *Kincaid v. Parsons*. There, we said that the tobacco issue "cannot be left to the sole discretion of the administrator...." *Kincaid*, 191 W.Va. at 609, 447 S.E.2d at 544. We understand that the selection of designated areas for tobacco use must necessarily be unique, to at least some degree, at each facility. However, the decision of whether to permit any tobacco use and where, must be controlled by some guidelines or suitable discretion either from the Standards Commission or by policy directives of the Division of Corrections in order to avoid the proscription of *Kincaid* that such issues cannot be left to the sole discretion of the chief executive officer.

■ We have commented on the refusal of the Commission to deal with the disparate effect of the regulations on different prisoners in the custody of the Division of Corrections, the failure of the Commis-

sioner to review whether different standards ought to apply to pretrial detainees, and the decision of the Commission to grant each chief executive officer of each correctional facility unfettered discretion. The disparate, inconsistent treatment of similarly-situated parties, and particularly the setting of different standards for similar situations, may be seen as a textbook description of arbitrary conduct, absent articulation of good reason therefor. We agree with the Appellate Division of the Supreme Court of New York that "an agency may not act in such a way as to result in disparate or inconsistent treatment of similarly situated parties, and to adopt different standards for similar situations is to act arbitrarily." *Sunrise Manor Nursing Home v. Axelrod,* 135 A.D.2d 293, 297–98, 525 N.Y.S.2d 367, 370 (1988).

For the reasons outlined, we award the writ, moulded as follows: Regulations 95 C.S.R. 1 and 95 C.S.R. 2 may not be enforced. Appropriate replacement regulations may be proposed and adopted as provided by law. Pending full consideration of any such proposed regulations, the practices regarding tobacco possession and use in force prior to June 3, 1996, shall be in effect, except as the same are modified for good cause found by the chief executive officer of any facility and approved in good faith by his or her superior. In considering any proposed tobacco use regulations it deems appropriate under this writ and general law, the commission shall give adequate consideration to favorable and adverse comments, to the status of pretrial detainees, any constraints on disparate treatment of similarly situated parties and such other factors which may appear appropriate, including legitimate penological objectives.

Writ granted as moulded.