625 S.E.2d 341

STATE of West Virginia ex rel. James William BERRY, Sr., Petitioner,

v.

Thomas L. McBRIDE, Warden, Mt. Olive Correctional Center, Respondent.

No. 30696.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 11, 2005.

Filed: Nov. 30, 2005.

Jason E. Huber, Esq., Forman & Huber, PC, Charleston, for Petitioner.

Darrell V. McGraw, Jr., Attorney General, Charles P. Houdyschell, Assistant Attorney General, Charleston, for Respondent.

Justice STARCHER delivered the Opinion of the Court.

STARCHER, J.

In the instant case we adopt the recommendations of a special master appointed by this Court and hold that double-bunking in correctional facilities is not barred by State regulations; and that the decision whether an inmate should or should not be housed in a single cell must be made pursuant to enforceable standards, policies, and procedures that are based on pertinent medical and other relevant criteria.

## I.

### Facts & Background

This matter is before this Court upon James William Berry's petition asserting that the respondent warden of the Mount Olive

Correctional Complex ("MOCC") in the past has required (and in the future may require) the petitioner Mr. Berry to share a cell at the MOCC with another inmate. (We will refer to this practice as "double-bunking.")

The petitioner began the instant case by filing a petition *pro se* invoking the original jurisdiction of this Court, to which the respondent replied; and the case was thereafter submitted for decision. This Court subsequently issued an opinion finding most of the grounds for the petitioner's claim to be entitled to be housed in a single cell to be without merit.[1] *State ex rel. Berry v. McBride,* No. 30696, 2002 WL 31681823 (November 27, 2002) (opinion withdrawn upon grant of rehearing, January 16, 2003).

However, this Court's now-withdrawn opinion did conclude that *West Virginia Code of State Regulations,* Title 95–2–8.7 [2] prohibited the respondent from housing more than one inmate in a correctional facility (as opposed to an inmate in a jail) in a cell designed for single occupancy. On that basis, the withdrawn opinion granted the petitioner's requested writ.

Title 95–2, "Minimum Standards for Construction, Operation, and Maintenance of Correctional Facilities," was promulgated in 1996 and states in pertinent part that:

> 8.7. Single Occupancy. Only one inmate shall occupy a room or cell designed for single occupancy....

However, in 1998 the Legislature added language at *W.Va.Code,* 31–20–9(a)(2) [1998] to state in pertinent part:

> Provided, That rules filed by the jail and correctional facilities standards commission and authorized by the Legislature to be promulgated before the amendment to this section enacted in the regular session of the Legislature in the year one thousand nine hundred ninety-eight remain in force except that such previously promulgated rules no longer apply to: (i) *Correctional facilities;* ... [emphasis added].

After this Court issued its original opinion in the instant case, the respondent requested that this Court rehear the instant case and reconsider our decision in light of the foregoing-quoted 1998 amendment. We granted the respondent's request, withdrew our original opinion, and appointed counsel to represent the petitioner.

Upon the parties' request, this Court thereafter referred this matter to Judge Derek C. Swope to serve as special master for the purposes of supervising the taking of depositions and facilitating discovery. This Court further ordered that at the conclusion of discovery, the special master should make such findings of fact and conclusions of law as are necessary to address the issues presented by the parties and to permit adequate review by this Court.

The special master received the memoranda of both parties and issued an Interim Report requesting additional discovery. The additional discovery matters having been concluded, the special master then submitted recommended findings of fact and conclusions of law to this Court, which we largely adopt and incorporate herein. We appreciate the special master's thorough and reasoned approach to the matters that were before him. Upon oral argument and a review of the briefs on rehearing, we issue this opinion, replacing our previously-issued opinion in the instant case.

### A.

#### *Special Master's Findings*

The Mount Olive Correctional Complex where the petitioner is housed by the respondent is a correctional facility that currently houses approximately 980 inmates, and originally did not place more than one person in each cell. According to the special master's report, the cells at MOCC were originally designed so that they could be modified to house two inmates, but the architect deleted that design feature before the construction of the MOCC. However, when the MOCC popu-

---

1. We do not find it necessary to address these grounds in this opinion other than to state that we reaffirm our previously-stated conclusion that they are without merit.

2. 95–2–8.7 was referenced in this Court's original opinion in the instant case as "95–2–8.6."

lation exceeded bed and cell space, the respondent began double-bunking inmates. The increase in population assertedly occurred when a large number of prisoners held in county or regional jails were ordered to be transferred to West Virginia Division of Corrections facilities. *See State ex rel Sams v. Kirby*, 208 W.Va. 726, 542 S.E.2d 889 (2000).

The petitioner has been incarcerated at the MOCC since May 17, 1997, and is serving a life sentence. The petitioner asserts that the physicians at the Veterans Administration Hospitals in Huntington and Beckley have determined that he is seventy-five percent disabled. The petitioner is required to move about in a wheelchair as a result of being struck by an automobile. The petitioner contends that he suffers from nerve damage and degenerative arthritis.

The petitioner was first double-bunked for approximately four months during his classification period at MOCC. From 1997 until approximately December 2001, the petitioner occupied a single cell by himself.

In December 2001, the petitioner was sent to "lockup" for ninety days. Upon returning from lockup, the petitioner was placed in a single cell, but over a period of approximately six months, four other inmates were moved into and out of the petitioner's single cell. The petitioner asserts that he had no personal problems with the first three inmates, but that the fourth inmate consistently abused the petitioner, and preyed upon him based on his disability. The petitioner contends that even when he is alone, his cell is difficult to move around in; and when another inmate is housed in his cell, it is extremely difficult, painful, and awkward for him to move about in his cell. It appears that currently the petitioner is not double-bunked.

Upon reviewing the documentary record before him, the special master found no mention of the petitioner's having received a medical assessment related to the issue of his suitability for single- or double-bunking, or of any objective medical or other criteria being used by MOCC in determining whether the petitioner should be housed in a single cell. The special master requested additional submissions from the parties on this issue.

In response, the petitioner asserted that MOCC has no objective criteria to evaluate an inmate's physical and/or psychiatric need for a single cell. The petitioner contended that there are no general standards and that all inmates are evaluated, if at all, on an *ad hoc* and standardless basis.

The respondent asserted that medical professionals at MOCC assess individuals similarly situated to petitioner "based upon their individual medical needs." According to the special master's report, the respondent asserts that medical protocols or criteria "would be" based upon an accepted standard of care, and that the medical unit will order special accommodations to inmates "as needed;" and that should the medical unit find a condition which would permit an inmate to reside within the general population but require single housing, it would be the "desire" of corrections to adhere to the clinical judgment of its medical professionals.

The special master requested information concerning whether Mr. Berry was in fact medically assessed for his condition and for his suitability for double bunking. The petitioner asserted that the respondent admitted that the medical unit did not specifically evaluate Mr. Berry in order to determine if he needed a single cell.

The special master inquired of the parties as to whether MOCC's determination of Mr. Berry's medical disability was based upon the assessment of medical professionals using any objective criteria, and, if so, whether such a determination might play a role in his being double-bunked in the future. The petitioner asserted that since Mr. Berry was never assessed, the respondent's determination could not have been made based upon objective criteria. The petitioner contends that it is impossible to determine what criteria the respondent will use to make housing decisions for Mr. Berry in the future.

The respondent states that "consideration" is given to inmates with severe medical disabilities, inmates with mental illness, sexual predators, inmates likely to be exploited, or inmates who have other special needs. The

respondent contends that medical assessments and decisions are made by a physician, nurses and physician assistant, and the staff at MOCC does not "second guess" the clinical judgment of the physicians.

## II.

### Standard of Review

■ This Court's standard for issuing a writ of mandamus is well-established: "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). The pertinent factual matters in the instant case are undisputed and our ruling in this original jurisdiction case is, with the assistance of the special master's report, *de novo*.

## III.

### Discussion

■ The respondent argues that in our earlier and now-withdrawn opinion in the instant case, this Court improvidently applied the standard set forth in *West Virginia Code of State Regulations*, Title 95-2-8.7 to the Division of Corrections, because of Legislative action relating to that regulation in 1998. As further discussed *infra*, we agree with this contention.

The respondent also contends that language in this Court's decision in *State ex rel. White v. Parsons*, 199 W.Va. 1, 483 S.E.2d 1 (1996) constituted a ruling that all of the regulations in Title 95, Series 1 and 2 (the regulations at Series 1 cover standards for jails, those at Series 2 cover standards for correctional facilities) are generally unenforceable.

The language in question from *White v. Parsons* is found at the end of the opinion and was used by this Court in granting the requested writ of prohibition in that case:

Regulations 95 C.S.R. 1 and 95 C.S.R. 2 may not be enforced. Appropriate replacement regulations may be proposed and adopted as provided by law.

199 W.Va. at 11, 483 S.E.2d at 11.

However, despite the facial breadth of the foregoing-quoted language (which is not the language that was used in the syllabus point of the opinion), *White v. Parsons* in fact involved only the narrow issue of smoking regulations in jails and correctional facilities.

No reasonable reading of the *White v. Parsons* opinion supports the conclusion that its ruling was intended to invalidate the entire range of provisions in Title 95, Series 1 and 2 that are unrelated to the issue of smoking in jails and correctional facilities. Consequently, we hold that *State ex rel. White v. Parsons*, 199 W.Va. 1, 483 S.E.2d 1 (1996) did not invalidate the entire range of regulatory provisions in Title 95, Series 1 and 2.[3]

As previously noted, we agree with the special master's conclusion that the Legislature's action in 1998 was intended to remove the statutory authority for *West Virginia Code of State Regulations*, 95-2-8.7, as it applies to correctional facilities; and assuming the constitutional validity of the Legislature's action, this regulation no longer operates to prohibit double-bunking in

**3.** *State ex rel. White v. Parsons* did, however, consider the issue of whether the chief executive officer of each jail or correctional facility could validly be granted unguided and unfettered personal discretion to permit or prohibit the use and possession of tobacco in designated areas at the facility under his control. The Court's analysis of that issue in *White v. Parsons* is relevant to the instant case. Looking back to this Court's decision in *State ex rel. Kincaid v. Parsons*, 191 W.Va. 608, 609, 447 S.E.2d 543, 544 (1994), where this Court stated that tobacco use regulation "cannot be left to the sole discretion of the administrator ... [,]" this Court in *White v. Parsons* noted that the decision of whether to permit tobacco use and where tobacco use may occur, must be controlled by written guidelines or other standards for the exercise of suitable discretion—either from the standards commission or by policy directives of the division of corrections—in order to avoid the proscription of *Kincaid* that such issues cannot be left to the sole discretion or whim of the institution's chief executive officer. *White v. Parsons, supra*, 199 W.Va. at 11, 483 S.E.2d at 11.

584

cells designed for single occupancy at correctional facilities.

■ The petitioner argues, however, that the 1998 amendment to *W.Va.Code*, 31–20–9 is invalid with respect to *West Virginia Code of State Regulations*, 95–2–8.7 because the amendment violates the petitioner's constitutional due process and equal protection rights by creating an arbitrary and capricious distinction between inmates in jails and inmates in correctional facilities with respect to double-bunking that is not rationally related to any legitimate governmental interest. (The record is unclear as to exactly what policy or practice differences exist with respect to double-bunking between jails and correctional facilities.)

When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment.

Syllabus Point 3, *Willis v. O'Brien*, 151 W.Va. 628, 153 S.E.2d 178 (1967).

In *State ex rel Sams v. Kirby*, 208 W.Va. 726, 542 S.E.2d 889 (2000), this Court recognized that regional and county jails serve a different purpose, as compared to State correctional facilities. The conditions of shorter-term housing in jails and longer-term housing in correctional facilities make the management of institutional populations in jails and correctional facilities somewhat different matters, and presumptively justify the existence of some degree of difference in policies with respect to double-bunking. Upon our review of the record, we conclude that this separate and distinct purpose for the two types of facilities means that the existence of different legislatively-created policies for double-bunking in jails and correctional facilities is not *per se* arbitrary and capricious and meets the "rational relationship" test in the instant case.[4]

We therefore conclude and hold that the Legislature acted constitutionally in amending *W.Va.Code*, 31–20–9 [1998] insofar as that amendment requires that *West Virginia Code of State Regulations*, Title 95–2–8.7 relating to double-bunking in cells designed for single occupancy does not apply to correctional facilities.

Based on the special master's extensive discussion as recited *supra* regarding the current lack of any objective standards or criteria or established procedures at the MOCC to evaluate individuals for possible single-bunking, the special master concluded that objective standards for assessing an individual's medical or other unsuitability for double-bunking should be developed, and that Mr. Berry should be assessed under those standards, if the MOCC intends to possibly double-bunk him in the future.

■ The special master further concluded that although the medical assessment of inmates must be based upon an acceptable standard of care, the determination of an inmate's housing needs should be based upon some objective criteria and in consideration of the inmate's medical assessment and other pertinent factors, including, but not limited to mobility/ability to ambulate, flexibility, strength, bowel function, etc.; and that the current internal institutional appeal procedure could easily be adopted to handle any complaints of improper/arbitrary evaluation and housing. The special master also recommended that a process of review internal to the division of corrections similar to that in place for other housing grievances filed by inmates be implemented for the single-bunking issue.

Additionally, the special master recommended that the respondent be required to evaluate and assess the petitioner according to said objective criteria in order to determine the suitability of his housing in light of his physical condition and individual circumstances. And in briefing submitted to this Court, respondent's counsel did not contest

4. We also do not think that the concerns that were discussed in *SER White v. Parsons* are implicated by the 1998 amendment to *W.Va.Code*, 31–20–9—because the differing treatment of prisoners in jails and correctional facilities with respect to single- and double-bunking at issue in the instant case is established by legislative action, and not by an administrator's *ad hoc* decision-making using unguided and standardless discretion.

the feasibility (or even the reasonableness) of implementing such criteria, standards, and procedures.

The special master's recommendation is consistent with our discussion in *White v. Parsons* regarding the issue of standardless discretion, *see* discussion at note 3 *supra.* The special master's recommendation is also consistent with this Court's recent holding in *Weirton Heights VFD v. State Fire Comm'n.*, 218 W. Va. 668, 628 S.E.2d 98, 2005 WL 3093204, No. 32721 (November 17, 2005) (the absence of duly promulgated standards and criteria for governmental decision-making supports a finding that the decision in question is arbitrary and capricious and an abuse of discretion).

The special master's report further discusses the issue of criteria and standards for evaluating an inmate for single-bunking by calling attention to the respondent's Policy Directive 101.00, which states (according to the report):

> In addition, all policies and procedures set forth by the Policy Directives, Operational Procedures, Post Orders, and other written documents of the Division of Corrections are solely for the guidance of officers, employees, and agents of the Division of Corrections. These Policy Directives, Operational Procedures, Post Orders, and other written documentation are not intended to and cannot be relied upon to create rights, substantive or procedural, enforceable by any party [in] ... any litigation, grievance, or other matter with the Division of Corrections, or any officer, employee, agent or servant.

The petitioner asserts that the respondent, relying on this language, claims to be free to choose which of his institution's written policies he will apply and follow and which ones he will not; and that the respondent claims to be unaccountable in any forum to any person, inmate or otherwise, for any failure or refusal to follow the prescription of the institution's own written policies. The petitioner contends that such a position, if upheld, would impermissibly render any written procedures, policies, or standards relating to double-bunking without practical or legal effect.[5]

Addressing this issue, the special master's report cites to *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 65, 459 S.E.2d 329, 342 (1995), where this Court stated:

> It is ... a basic notion of due process of law that a governmental agency must abide by its own stated procedures even though it is under no constitutional obligation to provide the procedures in the first place and even though it can change the procedures at any time; so long as the procedures are in place, the agency must follow them.

This Court has consistently held that the basic due process guarantees of the West Virginia Constitution apply to incarcerated individuals. *Watson v. Whyte*, 162 W.Va. 26, 245 S.E.2d 916 (1978). In *Rowe v. Whyte*, 167 W.Va. 668, 280 S.E.2d 301 (1981), this Court examined a situation where the parole board allegedly violated a prisoner's reasonable expectation of release upon parole, by the failure of the parole board to follow the requirements of *W.Va.Code*, 62–12–13 [1979] concerning release upon parole. This Court determined in *Rowe v. Whyte* that the West Virginia Board of Probation and Parole abused its discretion within the meaning of *W.Va.Code*, 62–12–13 [1979] and held that the board acted in an arbitrary and capricious fashion in the manner in which it denied the petitioner release upon parole.

The special master concluded that the foregoing "caveat" or "disclaimer" in Policy Directive 101.00, if applied literally, would conflict with the rule of law stated in *Williams v. Precision Coil, Inc., supra*, that a governmental agency must abide by its own stated procedures. We agree. If officials are free to ignore the written procedures and standards that they have created, then we have a government of individual

5. The respondent replies to this assertion by stating that "[C]orrections does not write policies with the intent of ignoring them[;]," but the respondent does not challenge or contradict petitioner's characterization of respondent's position disclaiming any legally enforceable effect or significance of the respondent's own written policy directives, etc.

persons and their "whims"—and not one of laws.[6]

Based on the foregoing reasoning and in accord with the recommendations of the special master, we hold that the constitutional principles of equal protection and due process of law, *W.Va. Const.* art. 3, § 10, require that decisions regarding whether an inmate in a State correctional facility should be housed in a single cell must be made pursuant to enforceable standards, policies, and procedures that are based on pertinent medical and other relevant criteria.

## IV.

### *Conclusion*

Enforceable standards, policies, and procedures related to single- and double-bunking that are based on pertinent medical and other relevant criteria are hereby ordered to be developed and implemented by the respondent in a timely fashion and to be applied to the petitioner in the event that he is again considered for double-bunking.[7] The writ of mandamus is granted as moulded.

Writ Granted as Moulded.

**6.** The respondent's brief suggests that to recognize the principle that public officials must comply with their own written policies, etc., would "give a weapon to inmates." Such a statement, while understandable in the context of zealous advocacy, is incorrect. Of course it is true that prison officials, who operate with enormous responsibilities and clearly inadequate resources under strongly competing and conflicting pressures, must have large amounts of discretion in controlling many aspects of inmates' lives—for the soundest of reasons. But when written policies and procedures are put into place to define and guide the exercise of that discretion, they must be followed—or changed in accordance with the law. *Williams v. Precision Coil, Inc., supra.*

In a system directed at the custody, management, and rehabilitation of persons who have broken the rules, what kind of "double standard" message would it send to say that prisoners must follow the rules—but prison officials need not? Prison rules, regulations, policies, and procedures are not violent "weapons" like clubs, tear gas, pepper spray, TASERS, or rifles—that can be legitimately wielded only by prison officials when necessary. Prison rules, regulations, policies, and procedures are nonviolent standards of conduct that must be followed by—and may be called upon by—everyone.

**7.** The petitioner's case may be technically moot at this time; but the important issues involved in the instant case are readily capable of repetition, while easily escaping review. As such, it is appropriate that this Court address these issues. *See State ex rel. Shifflet v. Rudloff*, 213 W.Va. 404, 407, 582 S.E.2d 851, 854 (2003).